## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **NO.    A-25-CR-00393** |
| | § | |
| **THOMAS AUSTRIA CROUSE** | § | |

## MOTION TO DISMISS SUPERSEDING INDICTMENT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE ROBERT PITMAN:

NOW COMES Defendant Thomas Austria Crouse, through undersigned counsel, and files this motion to dismiss the indictment. Mr. Crouse is charged in a seven-count superseding indictment with five counts of violating 18 U.S.C. § 875(c) and two counts of violating 18 U.S.C. § 2261A(2). ECF Doc. No. 28. Mr. Crouse moves this Court to dismiss each count of the indictment. First, Mr. Crouse moves to dismiss each count because each seeks to prosecute him for constitutionally protected speech under the First Amendment. No count alleges a true threat, and Mr. Crouse's statements were on a matter of public concern and are entitled to special protection under the First Amendment.

Second, Mr. Crouse moves to dismiss Counts One through Five because § 875(c) is unconstitutionally vague and overbroad. The prosecution violates the Fifth Amendment's Due Process Clause because it deploys a threat statute that is void for vagueness. The statute fails to give a person of ordinary intelligence notice of what conduct is forbidden as it provides no fair warning of what statements will qualify as criminal threats. *Pappachristou v. Jacksonville*, 405 US. 156 (1972). Third, Mr. Crouse moves to dismiss Counts Six and Seven because § 2261A(2) is unconstitutional as applied.

In support of his motion, Mr. Crouse shows as follows:

## I.    Factual Background

Each of the charges in the indictment stem from statements Mr. Crouse made to the offices of various politicians in response to the passage of the One Big Beautiful Bill Act, P.L. 119-21, aka "the Big Beautiful Bill," and various anti-immigrant actions taken by the Trump administration in the summer of 2025. Between June 9, 2025, and August 26, 2025, Mr. Crouse contacted numerous politicians to lodge complaints about various policies and legislation. Mr. Crouse contacted elected officials and other political figures in the Trump administration through publicly available means, specifically:

- Count One is a voicemail Mr. Crouse left on August 25, 2025, on the phone number listed for Will Scharf, Staff Secretary to President Trump, on the Florida Bar website;

- Count Two is a voicemail Mr. Crouse left on August 26, 2025, on the abovementioned number for Scharf;

- Count Three is a post on X, formerly Twitter, that Mr. Crouse posted on June 9, 2025 directed "@Sec_Noem," the public account for Kristi Noem, the Secretary of the Department of Homeland Security;

- Count Four is a voicemail Mr. Crouse left on July 3, 2025, on the main line for the DC office of Senator Kevin Cramer, Republican, North Dakota;

- Count Five is a voicemail Mr. Crouse left on July 18, 2025, on the main line for the DC office of Senator Tedd Budd, Republican, North Carolina;

- Count Six is a series of three voicemails Mr. Crouse left on August 21, 2025, on the main line for the office of Senator John Cornyn, Republican, Texas;

- Count Seven is a series of four voicemails Mr. Crouse left on August 26, 2025, on the publicly available phone number for Will Scharf.

Because none of Mr. Crouse's statements, as a matter of law, constitute serious expressions that he would commit an unlawful act of violence, the Court should dismiss the superseding indictment.

## II.    Legal Standard

Federal Rule of Criminal Procedure 12 provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." FED. R. CRIM. P. 12(b)(1). If a pretrial motion presents a question of law in a case involving undisputed facts, Rule 12 authorizes the court to rule on the motion. *United States v. Flores*, 404 F.3d 320, 325 (5th Cir. 2005); *see* FED. R. CRIM. P. 12(d) (permitting the court to rule on a motion involving factual issues provided the court states its essential findings on the record); *see also*, *United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) ("a pretrial dismissal is essentially a determination that, as a matter of law, the government is incapable of proving its case beyond a reasonable doubt."). Otherwise, the court would waste resources by allowing a case to proceed to trial and later dismissing it based on the same legal argument and facts presented through a pretrial motion. *See Flores*, 404 F.3d at 325.

An indictment should be dismissed if the specific facts alleged in the charging document do not, as a matter of law, satisfy the elements of the offense. *See United States v. Paranella*, 277 F.3d 678, 685 (3d Cir. 2002) *abrogated on other grounds by Skilling v. United States*, 561 U.S. 358, 410 (2010) ("[A] charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."); *United States v. Alkhabaz*, 104 F.3d 1492, 1493 (6th Cir. 1997) (concluding that the indictment failed, "as a matter of law," to allege violations of § 875(c)); *United States v. O'Dwyer*, No. 10-CR-00034, 2010 WL 2606657 at *2-3 (E.D. La. Jun. 24, 2010) (dismissing indictment because plain language of alleged threat did not constitute a threat under § 875(c)).

Where, as here, a person's speech is at issue, the determination of whether a person's speech is a "true threat" falls appropriately in the hands of the Court. *See United States v. Lincoln*, 403 F.3d 703, 705-06 (9th Cir. 2005); *see also Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 510–11 (1984) ("[Judges]—and particularly Members of this Court—must exercise such review in order to preserve the precious liberties established and ordained by the Constitution."). "Whether a written communication contains either constitutionally protected 'political hyperbole' or an unprotected 'true threat' is a question of law and fact that [courts] review de novo." *United States v. Bly*, 510 F.3d 453, 457 (4th Cir. 2007); *see also United States v. Francis*, 164 F.3d 120, 123 n.4 (2d Cir. 1999) ("we note that the question of whether a defendant's communication is a true threat rather than speech protected by the First Amendment—*a threshold question of law for the court*—is different from the question of whether a reasonable person would interpret the communication as a true threat—a question for the jury at trial.") (emphasis added, citations omitted).

Here, the issues are pure questions of law in the presence of undisputed facts. Mr. Crouse moves this Court to dismiss the superseding indictment because it seeks to prosecute him for speech protected by the First Amendment. Additionally, Mr. Crouse moves to dismiss Counts One through Five because 18 U.S.C. § 875(c) is unconstitutionally vague and overbroad.

### III.    Argument

Because Mr. Crouse's prosecution under both 18 U.S.C. § 875(c) and 18 U.S.C. § 2261A(2) involve punishment of pure speech, the prosecution necessarily implicates and is limited by the First Amendment. *See Watts v. United States*, 394 U.S. 705, 707 (1969) (holding in the context of 18 U.S.C. § 871, which criminalizes threats against the President, that statutes which

criminalize pure speech must be interpreted with the commands of the First Amendment in mind). "What is a threat must be distinguished from what is constitutionally protected speech." *Id.*

A foundational principle of this country is the right to engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts*, 394 U.S. at 708 (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)). "The language of the political arena… is often vituperative, abusive, and inexact." *Id.* Mr. Crouse's statements are protected by the First Amendment.

**A. Mr. Crouse's statements are protected by the First Amendment.**

The First Amendment states in relevant part, "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. Indeed, the First Amendment protects speech even when the subject or manner of expression is uncomfortable or unconventional. The "bedrock principle underlying the First Amendment" is "that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Rather, a "hallmark" of free speech is "to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003) (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

The First Amendment permits restrictions upon the content of speech only in a few limited areas. *Counterman v. Colorado*, 600 U.S. 66, 73 (2023). One such category of unprotected speech is "true threats" of violence. *Id.* In order to be a "true threat," the statement, "when taken in

context," must convey a real possibility that violence will follow. *Id.* at 74. This distinguishes a "true threat" from jests or hyperbole. *Id.* True threats are "serious expressions" conveying that the speaker means to "commit an act of unlawful violence." *Id.* (quoting *Black*, 538 U.S. at 359).

In order for a communication to be a threat under § 875(c), the Fifth Circuit requires "in its context [it] would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *United States v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001) (quoting *United States v. Myers,* 104 F.3d 76, 79 (5th Cir.1997)). The key to distinguishing "true threats" from speech protected by the First Amendment is if the alleged threat had an "immediacy, or clarity of purpose." *Shackelford v. Shirley*, 948 F.2d 935, 939 (5th Cir. 1991). Furthermore, "[i]n order to convict, a fact finder must determine that the recipient of the in-context threat reasonably feared it would be carried out." *Morales*, 272 F.3d at 287 (quoting *Myers*, 104 F.3d at 80).

### 1. Statements about a political figure or matters of public concern receive heightened First Amendment protections.

"Not all speech is of equal First Amendment importance[.]" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (noting that where matters of purely private significance are at issue, First Amendment protections are often less rigorous) (cleaned up). Speech that is made in a "public place on a matter of public concern . . . is entitled to 'special protection' under the First Amendment." *Id.* at 458. Even when speech is "inappropriate or controversial," that is "irrelevant to the question [of] whether it deals with a matter of public concern." *Id.* at 453. The Supreme Court has recognized that speech deals with a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)). Additionally, a "subject of legitimate news

interest; that is, a subject of general interest and of value and concern to the public," is a matter of public concern. *Id.* (quoting *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 84 (2004)).

The statements charged in the indictment each concern a political figure or a matter of public concern and are therefore entitled to heightened First Amendment protections. In each of the charged statements, Mr. Crouse is expressing his political opinions about the passage of the Big Beautiful Bill and anti-immigrant actions taken by the Trump administration in the summer of 2025.

"[D]issenting political speech [is] at the First Amendment's core." *Counterman*, 600 U.S. at 81. Indeed, in her concurrence in *Counterman*, Justice Sotomayor noted:

> Especially in a climate of intense polarization, it is dangerous to allow criminal prosecutions for heated words based solely on an amorphous recklessness standard. Our society has often concluded that an intent standard sets a proper balance between safety and the need for a guilty mind, even in cases that do not involve the First Amendment. Surely when the power of the State is called upon to imprison someone based on the content of their words alone, this standard cannot be considered excessive.

*Id.* at 104–05 (Sotomayor, J., concurring). As Justice Sotomayor recognized, "[t]he risk of overcriminalizing upsetting or frightening speech has only been increased by the internet." *Id.* at 87.

### 2. Conditional or abstract statements are not true threats.

Context is critical when determining whether a statement is constitutionally protected speech or a "true threat." *Bailey v. Iles*, 87 F.4th 275, 285 (5th Cir. 2023) (citing *Watts*, 394 U.S. at 708). To be a "true threat," a communication must constitute a "serious expression" "conveying that [the] speaker means to 'commit an act of unlawful violence.'" *Counterman*, 600 U.S. at 74 (quoting *Virginia v. Black*, 538 U.S. 343, 359 (2003)). Importantly, the Fifth Circuit has held that "hypothetical and conditional" statements are not true threats as a matter of law. *United States v.*

*O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011). In *O'Dwyer*, the defendant was a debtor in bankruptcy court, and he emailed an employee of the bankruptcy court a message containing the statement:

> Maybe my creditors would benefit from my suicide, but suppose I become "homicidal"? Given the recent "security breach" at 500 Poydras Street, a number of scoundrels might be at risk if I DO become homicidal.

*Id.* at 19. The Fifth Circuit held that the statement was not a true threat as a matter of law because it was hypothetical and conditional. *Id.* at 20.

Similarly, the Second Circuit, in interpreting Section 875(c), reasoned that to be a "true threat" the statement must "on its face and in the circumstances in which it is made" be so "unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution." *United States v. Kelner*, 534 F.2d 1020, 1027 (2d Cir. 1976). Such a requirement is consistent with the First Amendment, which allows for prosecution when "a communication has become 'so interlocked with violent conduct as to constitute for all practical purposes part of the (proscribed) action itself.'" *Id.* (quoting T. Emerson, The System of Freedom of Expression, 329 (1970)). Nor do abstract statements about "planning" amount to a "true threat." *See United States v. Baker*, 890 F. Supp. 1375, 1386 (E.D. Mich. 1995), *aff'd sub nom. United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997) ("Section 875(c) ... does not address planning crimes, per se, but transmitting threats to injure or kidnap").

### 3.  None of the counts charging a violation of § 875(c) contain a true threat.

None of the statements alleged as threats in the superseding indictment are true threats. Mr. Crouse's comments are protected speech under the First Amendment, statements directed at public figures expressing his disagreement over contemporaneous political action.

### a. *The statement in Count One is not a true threat because it is a matter of public concern.*

Count One charges a violation of Section 875(c). The indictment alleges that Mr. Crouse called Will Scharf, the White House staff secretary for President Trump[1] and left a voicemail stating:

> Hey, if this is fucking [Will Shwarf, Will Scharf,] whatever man, the piece of fucking shit that's [handing Trump those executive orders,][2] if this is you, I'm going to find you, and I'm going to cut your fucking head off, bitch. I'm going to kill you, and then I'm going to kill your fucking family, bitch [fuck you.]

Will Scharf rose to notoriety in 2025 for his role as "the guy handing Trump those binders of executive orders" that President Trump signed on televised sessions in the Oval Office.[3] On August 25, 2025, the date of Mr. Crouse's voicemail, President Trump signed EO 14341, announcing the prosecution of flag desecration, and EO 14339, mobilizing the National Guard to Washington DC to combat the "crime emergency," among others.

A foundational principle of this country is the right to engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts*, 394 U.S. at 708 (quoting *Sullivan*, 376 U.S. at 270). Mr. Crouse's statement, while undoubtedly vehement, caustic, and sharp, concerns political opposition against political figures. Indeed, the voicemail specifically

---

[1] Prior to Trump appointing him staff secretary, Scharf was one of Trump's personal lawyers in the election interference case brought by special counsel Jack Smith.

[2] The indictment redacts the bracketed portions of the voicemail. Counsel includes the full voicemail because the full context of a statement is critical in determining whether it is a "true threat" or constitutionally protected speech.

[3] "Those binders full of executive orders that President Donald Trump has been signing with a flourish and a wide-tipped Sharpie during his first week in office don't just magically appear before him. White House staff secretary Will Scharf has been a prominent part of the tableau, standing at Trump's side and teeing up the leather-bound folders, one by one, for the president. With the cameras rolling, Scharf provides running narration on what Trump is signing, at times leaning into a nearby microphone at the president's direction."  Michelle L. Price, *Who's the guy handing Trump those binders of executive orders? Meet Will Scharf*, AP, Jan. 24, 2025, *available at* https://www.news4jax.com/news/politics/2025/01/24/whos-the-guy-handing-trump-those-binders-of-executive-orders-meet-will-scharf/

references executive orders that President Trump signed and the staff secretary's role in those executive orders becoming law.

To be a "true threat," and therefore constitutionally unprotected speech, the statement must be a serious expression "conveying that a speaker means to commit an act of unlawful violence." *Counterman*, 600 U.S. at 74. The Fifth Circuit has recognized that the key to distinguishing "true threats" from speech protected by the First Amendment is, to be a "true threat" the statement must contain an "immediacy, or clarity of purpose." *Shackelford*, 948 F.2d at 939. In order to distinguish "political hyperbole" from a "true threat," the Fifth Circuit has held that the statements must be analyzed "in context" to determine if they are true threats punishable by law. *Morales*, 272 F.3d at 287.

Here, there is no immediacy or clarity of purpose in the message. The message begins with uncertainty as to whether it will even reach a recipient ("*If* this is Will Scharf…"). The message lacks any specificity as to the place, time, or method of the purported conduct that is necessary to convey a real possibility that violence will follow. The context of the statement, which explicitly references recent executive orders, makes clear that the message is the type of "political hyperbole" protected under the First Amendment. The government may not restrict speech simply "because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).

Indeed, many public figures often direct similarly "vehement" and "caustic" attacks at political opponents or political figures whose policies they disagree with. For example, in November 2025, President Trump, in response to Democratic lawmakers saying the military shouldn't follow unlawful orders, endorsed another Truth Social user's call to "HANG THEM"

by sharing it on his own Truth Social feed.[4] Importantly, Senator Rick Scott defended President Trump, stating that Trump's message to hang Democrats was "hypothetical."[5] In September 2025, Arizona Republican State Representative John Gillette posted on X that U.S. Representative Pramila Jayapal, D-Wash., should be hanged after she urged people to protest President Trump in the streets.[6] In response to people celebrating the murder of Charlie Kirk in 2025, U.S. Senator Ted Cruz, R-Texas, spoke out to affirm that hate speech is protected under the First Amendment. "The First Amendment absolutely protects speech," Senator Cruz said, "It absolutely protects hate speech. It protects vile speech. It protects horrible speech. What does that mean? It means you cannot be prosecuted for speech, even if it is evil and bigoted and wrong."[7]

Political forums have long produced the type of caustic speech at issue here. During the 2008 presidential election, supporters of candidate John McCain often shouted "terrorist" and "kill him" when McCain referenced then-candidate Barack Obama.[8] Likewise, during the 2016 presidential election, then-candidate Trump, in reference to Hillary Clinton being able to nominate judges if she won the election, suggested she could be assassinated, stating "[i]f she gets to pick her judges, nothing you can do, folks. Although the second amendment people, maybe there is, I don't know. But I'll tell you what, that will be a horrible day."[9]

---

[4] Kevin Frey and Mychael Schnell, *Trump suggests some Democrats should be hanged—and some Republicans rush to his defense*, MS NOW (Nov. 20, 2025), https://www.ms.now/news/trump-calls-democrats-seditious-traitors-republicans-rcna245028.
[5] *Id.*
[6] Jerod MacDonald-Evoy, *Arizona lawmaker calls for WA congresswoman to be executed for urging Trump protests* (Sept. 25, 2025), https://washingtonstatestandard.com/2025/09/25/arizona-lawmaker-calls-for-wa-congresswoman-to-be-executed-for-urging-trump-protests/
[7] Landon Mion, *Ted Cruz says hate speech 'absolutely protected' by First Amendment following Charlie Kirk's assassination* (Sept. 17, 2025), https://www.foxnews.com/politics/ted-cruz-says-hate-speech-absolutely-protected-first-amendment-following-charlie-kirks-assassination
[8] Daniel Nasaw, *US election: McCain rallies grow negative as Obama rises in the polls* (Oct. 9, 2008), https://www.theguardian.com/world/2008/oct/09/uselections2008.johnmccain4.
[9] David Smith, *Donald Trump hints at assassination of Hillary Clinton by gun rights supporters* (Aug. 10, 2016), https://www.theguardian.com/us-news/2016/aug/09/trump-gun-owners-clinton-judges-second-amendment.

Mr. Crouse's statement is protected First Amendment speech because it discusses matters of public concern and, taken in context, does not convey a serious expression that he means to commit an act of unlawful violence. The Court should dismiss Count One.

### b. The statement in Count Two is not a true threat because it is hypothetical and conditional.

Count Two charges a violation of Section 875(c) for leaving another voicemail for Will Scharf after the FBI confronted Mr. Crouse about the prior voicemail.[10] The indictment alleges that Mr. Crouse left this voicemail stating:

> "Dude, telling the fucking FBI, you's a bitch…Let me catch you in public; I'll knock you the fuck out, bitch."

This statement is not a "true threat" because it is "hypothetical and conditional." *See O'Dwyer*, 443 Fed.App'x. at 20.

In *Watts,* the Supreme Court drew a distinction between threats that are "political hyperbole" and thus entitled to constitutional protection, and "true threats" that are not protected. *Watts* involved statements made at an anti-war rally, where the defendant, after referring to his draft classification, stated "[i]f they ever make me carry a rifle, the first man I want to get in my sights is L.B.J." 394 U.S. at 706. To analyze whether the threat was a "true threat," the Court considered the context in which the threat was made, including "the expressly conditional nature of the statement." *Id.* at 708. The Court held that it was not a true threat because the statement was

---

[10] In July 2025, following Mr. Crouse's post on X, an agent with the U.S. Secret Service traveled from DC to Austin to interview Mr. Crouse, as well as members of his family and his friends and determined, following multiple interviews, that Mr. Crouse did not pose a threat and chose not to refer the investigation for prosecution. Mr. Crouse was subsequently interviewed in person again by FBI agents on August 26, 2025, following calls to Will Scharf. Agents reported Mr. Crouse was remorseful and made calls after he got high on marijuana and spent too much time on social media.

expressly conditioned on a predicate action, i.e., *"if* they ever make me carry a rifle," that had not

occurred. *Id.*

Here, just as in *Watts*, the statement is political hyperbole and expressly conditional. The

messages are part of a larger string of messages Mr. Crouse left expressing his political objection

to the Big Beautiful Bill. Further, just like the statements in *O'Dwyer* and *Watts*, Mr. Crouse's

statement was conditional. Black's Law Dictionary defines "conditional" as:

> 1. Subject to, depending on, or limited by one or more stipulations or qualifications; made
> or granted on specified terms that must be satisfied; not absolute <conditional obligation>
> <conditional pardon>.
>
> 2. (Of a proposition or syllogism) dependent on the existence or occurrence of some
> postulated event or thing; hypothetical.

CONDITIONAL, Black's Law Dictionary (12th ed. 2024). Mr. Crouse's statement is conditional

because it is dependent on the existence of another occurrence or event. The statement that he

would knock the staff secretary out is expressly conditioned on Mr. Crouse seeing him in public.

The key to distinguishing "true threats" from speech protected by the First Amendment is

if the alleged threat had an "immediacy, or clarity of purpose." *Shackelford*, 948 F.2d at 939. A

conditional statement such as this does not have the required "immediacy" to be a true threat.

Furthermore, for a statement to be a true threat under § 875(c), the Fifth Circuit requires

"in its context [it] would have a reasonable tendency to create apprehension that its originator will

act according to its tenor." *United States v. Morales*, 272 F.3d 284, 287 (5th Cir. 2001) (quoting

*United States v. Myers,* 104 F.3d 76, 79 (5th Cir.1997)). Statements that may have 'undoubtedly

frightened" the object of the statements may yet fail to satisfy the requirement of "convey[ing] a

*serious expression of intent*" by the speaker to engage in unlawful violence against another

person." *United States v. White*, 670 F.3d 498, 514 (4th Cir. 2012), *abrogated on other grounds by Elonis v. United States*, 575 U.S. 723 (2015).

Here, Mr. Crouse was calling various government officials, lodging his objections to pending legislation. Mr. Crouse's statement is not a "true threat" because it is conditional statement made to a political figure while lodging his protest to a piece of legislation. A true threat must be unequivocal, unconditional, immediate and specific as to the person threatened. *See Kelner*, 534 F.2d at 1027. While many may find the manner in which Mr. Crouse lodged his complaints offensive, the "bedrock principle underlying the First Amendment" is "that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Johnson*, 491 U.S. at 414. The statement is constitutionally protected speech and the Court should dismiss Count Two.

### c. The context in which the statement in Count Three was made weighs against finding a true threat.

Count Three charges a violation of Section 875(c), alleging that on June 9, 2025, Mr. Crouse posted on a message on X, formerly Twitter, tagging "@Sec_Noem," the public X account[11] for Krisi Noem, the Secretary of the Department of Homeland Security:

> "imma kill you you stupid stank bitch you're gonna fucking die by my hand I'm gonna murder you and your whole fucking family."

Mr. Crouse's X page from the same date also showed him commenting and voicing his opposition to another X user's posts that advocated for military force to be used against anti-ICE rioters.

---

[11] The @Sec_Noem account has over 730,000 followers on X.

While undoubtedly "very crude" and "offensive," a foundational principle of this country is the right to engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts*, 394 U.S. at 708 (quoting *Sullivan*, 376 U.S. at 270).

What is especially significant about Count Three is that the statement was a public post on X, a public forum. This contexts heightens the scrutiny required. Statements made privately are more likely to fall into the category of "true threats." *See, e.g., United States v. Bly,* 510 F.3d 453, 459 (4th Cir. 2007) ("Unlike in *Watts*, the Letter was not addressed to a public audience . . . "); *see also White*, 670 F.32 at 513 (holding that statements "directed to others" on a public website rather than to an intended victim weighed against finding statements constituted a "true threat."); *United States v. Bagdasarian*, 652 F.3d 1113, 1121 (9th Cir. 2011) (noting that the fact that the defendant posted statements on a "non-violent discussion forum [] would tend to blunt any perception that statements made there were serious expressions of intended violence" and holding that statements encouraging others to shoot Obama did not satisfy objective standard to constitute a "true threat").

Indeed, as the Supreme Court has recognized, the central forum for the exchange of political views is now "cyberspace—the 'vast democratic forums of the Internet' in general, and social media in particular." *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (internal citations omitted). Social media allows users to "engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'" *Id.* at 105 (quoting *Reno v. American Civil Liberties Union,* 521 U.S. 844, 870 (1997)). The Court recognized that on Twitter "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* 104–05. And, importantly, many politicians, including governors in all fifty states

and almost every member of Congress have social media accounts for this very purpose. *See id.* at 105.

Imposing criminal liability for "public[ly] address[ed] [comments] … contain[ing] highly charged political rhetoric" requires "extreme care." *See N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 927 (1982). Recognizing the Constitution's protection of such speech does not endorse its content, but rather recognizes the foundational principle of this country of the right to engage in "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Watts*, 394 U.S. at 708 (quoting *Sullivan*, 376 U.S. at 270).

Indeed, the official Twitter account for the Department of Homeland Security (DHS), often posts "highly charged political rhetoric" including "vehement, caustic, and sometimes unpleasantly charged attacks." On December 10, 2025, the DHS account posted a video of law enforcement boarding a ship with the caption "KNOCKOUT. If you threaten our nation, or break the law, there is no place on land or sea where we won't find you."[12] On October 17, the DHS account posted a video of a young man saying "ICE We're on the way. Word in the streets cartels put a $50K bounty on y'all."[13] DHS posted the video with the caption "FAFO.[14] If you threaten or lay hands on our law enforcement officers we will hunt you down and you will find out, really quick. We'll see you cowards soon." *Id.*

---

[12] Department of Homeland Security (@DHSgov), X (Dec. 10, 2025), https://x.com/DHSgov/status/1998909254854746523.

[13] Department of Homeland Security (@DHSgov), X (Oct. 17, 2025), https://x.com/DHSgov/status/1979265889599131994. Since posting the video, questions have been raised about the videos validity. Joe Sommerlad, *Noem Accused of Posting Fake Video of Black Men Threatening ICE Agents*, Independent (Oct. 20, 2025) https://www.independent.co.uk/news/world/americas/us-politics/kristi-noem-dhs-tweet-ice-threat-b2848625.html.

[14] FAFO is a commonly used Internet acronym for "fuck around and find out."

Like these statements posted by DHS, Mr. Crouse's statements on Twitter are not "true threats." The tweet "when taken in context," does not convey a real possibility that violence will follow. *Counterman*, 600 U.S. 66 at 73. Rather, this statement on Twitter was made in a public place on a matter of public concern—the ramping up of ICE enforcement actions against immigrants—and is therefore entitled to protection under the First Amendment.

### d. The statements in Counts Four and Five are not true threats because they do not convey a real possibility that violence will follow and are, at most, conditional.

Count Four charges a violation of Section 875(c) for leaving a voicemail for U.S. Senator Kevin Cramer, Republican of North Dakota, stating:

> "[Kevin Cramer you're gonna fucking die. You're gonna kill yourself because you just betrayed this nation. You want to make America great again. You want to do something good for your country.] Put a fucking gun in your mouth and kill yourself, you stupid bitch, or I'll fucking find you and I'll fucking kill you myself. [Motherfucker, if you're a staffer listening to this shame on you for working for a fucking Nazi, you should put a gun in your mouth and kill yourself too. You stink. Motherfucker.]".[15]

The voicemail was left on July 3, 2025. The Big Beautiful Bill, which Senator Cramer voted for, passed the Senate on July 1, 2025, and passed the House on July 3, 2025. It was signed into law on July 4, 2025.

Count Five also charges a violation of Section 875(c), for leaving a voicemail for Senator Tedd Budd, Republican of Noth Carolina, stating:

> "[Hey Tedd Budd, you fucking dumb ass piece of shit. Listen the fuck up. You want to make America great again, instead of voting for a bill that bankrupts half your citizens, kill yourself. Put a fucking gun in your mouth and kill yourself, and this country will become greater than you could ever think.] You need to fucking die. If you don't kill yourself, I'll find you and I'll fucking kill you stupid bitch. [And guess what, if you're a fucking staffer

---

[15] The indictment does not include the bracketed portions of the voicemail. Counsel includes the full voicemail because the context of a statement is critical in determining whether it is a "true threat" or constitutionally protected speech.

listening to this, shame on you for working for a fucking Nazi. You should kill yourself too, motherfucker.]"[16]

This voicemail was left on the main office line for Senator Budd on July 18, 2025. Senator Budd also voted for the Big Beautiful Bill.

These statements are not true threats. As the Supreme Court has made clear "the 'true' in [true threat] distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow (say, 'I am going to kill you for showing up late')." *Counterman*, 600 U.S. at 74 (quoting *Watts*, 394 U.S. at 708).

The beginning of both statements do not threaten any action by Mr. Crouse at all—rather they are statements telling an elected official to commit suicide. To be a true threat, a statement must "create apprehension that its *originator* will act according to its tenor." *Morales*, 272 F.3d 284, 287 (5th Cir. 2001) (emphasis added). The first part of the statement contains nothing to indicate that Mr. Crouse will act in any manner. Rather, the first portion of both statements advocates for the recipient to act. A statement which calls for no action by the speaker and does not threaten the recipient with violence is not a "true threat." For example, in 2018, New York State Senator Kevin Parker tweeted at Republican spokeswoman Candice Giove, "Kill yourself!"[17] Senator Parker was scolded but not censured.[18]

Nor do the statements constitute true threats because Mr. Crouse says that if the recipients do not kill themselves, he will find them and kill them. These are conditional statements made to an elected official while lodging his protest to proposed piece of legislation. A true threat must be

---

[16] The government did not include the bracketed portions of this voicemail in the indictment. Counsel includes the entire voicemail to provide full context of the statement.
[17] Jesse McKinley, *Brooklyn Senator tells a G.O.P. foe to "kill yourself" on Twitter*, (Dec. 12, 2018), https://www.nytimes.com/2018/12/18/nyregion/kevin-parker-suicide-twitter-giove.html.
[18] Fred Mogul, *Democrats Scold—but Don't Censure—Senator Who Told Foe to Kill Herself*, (Dec. 20, 2018), https://www.wnyc.org/story/democrats-scold-dont-censure-senator-who-told-foe-kill-herself/

"unequivocal, unconditional, immediate and specific as to the person threatened." *Kelner*, 534 F.2d at 1027.

"[D]issenting political speech [is] at the First Amendment's core." *Counterman*, 600 U.S. at 81. Just because speech contains violent imagery or rhetoric does not preclude that speech from being political or from First Amendment protection. For example, in *United States v. Bagdasarian*, 652 F.3d at 1119, the Ninth Circuit reversed a conviction under 18 U.S.C. § 879(a)(3) for a defendant convicted of threatening to kill then Presidential candidate Barack Obama. The defendant posted statements on an online Yahoo! message board two weeks before the 2008 election stating, "Obama fk the niggar, he will have a 50 cal in the head soon" and "shoot the nig." *Id.* at 1115. Reversing the conviction, the Ninth Circuit held that the first statement "convey[ed] no explicit or implicit threat on the part of [the defendant] that he himself will kill or injure Obama." *Id.* at 1119. The court held that the second statement also did not impart a threat, as it was "an imperative intended to encourage others to take violent action, if not simply an expression of rage or frustration." *Id.* The court further cautioned that, "[w]hen our law punishes words, we must examine the surrounding circumstances to discern the significance of those words' utterance, but must not distort or embellish their plain meaning so that the law may reach them." *Id.* at 1120.

Indeed, numerous politicians have used similarly violent rhetoric to convey opposition to political action. For example, President Trump said shortly before the November 2024 election that former Representative Liz Cheney "should have guns trained on her face."[19] Also in 2024, then Governor Kristi Noem said that if then President Biden tried to federalize Texas National

---

[19] David A. Graham, *Trump Suggests Training Guns on Liz Cheney's Face*, The Atlantic (Nov. 1, 2024), available at: https://www.theatlantic.com/politics/archive/2024/11/trump-liz-cheney-war/680485.

Guard forces it could lead to civil war.[20] Specifically, she said "[i]f he's willing to do that and take away my authority as governor as commander-in-chief of those National Guard, boy, we do have a war on our hands."[21] Similarly, U.S. Representative Paul Gosar, R-Arizona, in November 2021 posted a video on his Twitter and Instagram accounts depicting him killing Representative Alexandria Ocasio-Cortez and attacking President Biden.[22] In the video, Representative Gosar is "portrayed as a cartoon anime-type hero and is seen attacking a giant with [Rep.] Ocasio-Cortez' face with a sword from behind. The giant can then be seen crumbling to the ground."[23] At another point in the video Representative Gosar is depicted flying through the air, swinging two swords at a character with President Biden's face.[24] Gosar issued a statement saying that the video doesn't espouse violence or harm towards either Representative Ocasio-Cortez or President Biden, but rather "symbolizes the battle for the soul of America when Congress takes up the President's economic package, which he said includes immigration provisions he disagrees with."[25]

Mr. Crouse's statements, like Rep. Gosar's, then Governor Noem's, and President Trump's, were "crude" and "offensive." *See Watts*, 394 U.S. at 707. But like those statements, Crouse's too are protected by the First Amendment because they are not true threats.

### B. Alternatively, Counts One through Five must be dismissed because Section 875(c) is unconstitutionally vague and overbroad.

Alternatively, Section 875(c) is void for vagueness and unconstitutionally overbroad. A criminal statute is void for vagueness if the conduct it prohibits is not clearly defined. *Grayned v.*

---

[20] Gideon Hess, *Kristi Noem warns of possible civil war amid border standoff*, Rolling Stone (Feb. 4, 2024).
[21] *Id.*
[22] Donie O'Sullivan, *Republican congressman posts video depicting violence against Ocasio-Cortez and Biden*, CNN (Nov. 10, 2021), available at: https://www.cnn.com/2021/11/09/politics/gosar-anime-video-violence-ocasio-cortez-biden.
[23] *Id.*
[24] *Id.*
[25] *Id.*

*City of Rockford,* 408 U.S. 104, 108 (1972). A criminal statute is unconstitutionally vague if it (1) "fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden," *United States v. Harriss*, 347 U.S. 612, 617 (1954), or (2) "encourages arbitrary and erratic arrests and convictions." *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). Fair notice for people "of common intelligence" is the "first essential of due process." *United States v. Davis*, 588 U.S. 445, 451 (2019) (cleaned up). For its part, the bar on arbitrary enforcement serves the separation of powers—Congress must clearly define crimes, not unelected "police officers, prosecutors, juries, and judges." *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018). Importantly, "standards of permissible statutory vagueness are strict in the area of free expression," meaning Congress may regulate in the realm of the First Amendment "only with narrow specificity." *NAACP v. Button*, 371 U.S. 415, 432–32 (1963).

Because § 875(c) implicates First Amendment freedoms, a heightened standard of scrutiny applies. For a challenge based on the First Amendment, courts may consider whether the statute is unconstitutionally vague on its face. *United States v. Williams*, 553 U.S. 285, 304 (2008). In the First Amendment context, "a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Id.* Section 875(c) is unconstitutionally vague because it fails to provide a person of ordinary intelligence fair notice of what speech is prohibited. While a scienter requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed," *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982), a statute that fails to include any scienter requirement lays "a trap for those who act in good faith." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979). In *Counterman*, the Supreme Court held that in prosecutions of true threats the government

21

must prove that "the defendant had some understanding of his statements' threatening character." 600 U.S. at 73. But 18 U.S.C. § 875(c) provides no such notice of this requirement. This omission from the statute chills the exercise of First Amendment freedoms.

Furthermore, in the context of laws criminalizing pure speech[26], the reckless *mens rea* is unconstitutionally vague. In her concurrence in *Counterman*, Justice Sotomayor stated:

> I agree with the Court's conclusion that the First Amendment requires a subjective *mens rea* in true-threats cases, and I also agree that recklessness is amply sufficient for this case. Yet I would stop there, leaving for another day the question of the specific *mens rea* required to prosecute true threats generally. If that question is reached, however, the answer is that true threats encompass a narrow band of intentional threats. Especially in a climate of intense polarization, it is dangerous to allow criminal prosecutions for heated words based solely on an amorphous recklessness standard. Our society has often concluded that an intent standard sets a proper balance between safety and the need for a guilty mind, even in cases that do not involve the First Amendment. Surely when the power of the State is called upon to imprison someone based on the content of their words alone, this standard cannot be considered excessive.

600 U.S. at 104–05 (Sotomayor, J., concurring).

The charges Mr. Crouse faces are the exact situation to which Justice Sotomayor refers: he faces prosecution for pure speech about political subjects in a climate of intense political polarization. As Justice Sotomayor recognized "[t]he risk of overcriminalizing upsetting or frightening speech has only been increased by the internet." *Id.* at 87.

That Section 875(c) requires only a reckless *mens rea* renders the statute unconstitutionally vague. A "determination of when angry hyperbole crosses the line will depend on amorphous norms around language, which will vary greatly from one discursive community to another." *Id.*

---

[26] In *Counterman*, the defendant was convicted under a Colorado stalking statute which made it unlawful to "[r]epeatedly ... make[ ] any form of communication with another person" in "a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... to suffer serious emotional distress." 600 U.S. at 70. The statute of conviction applies to someone who "[r]epeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person ... in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person ... serious emotional distress." *Id.* at 86 n. 1 (Sotomayor, J., concurring).

at 88. Such a standard does not provide fair notice of what type of speech is prohibited, particularly in the context of statements made to public officials about their role in the government.

Relatedly, Section 875(c) is also unconstitutionally overbroad. "The overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.,* 535 U.S. 234, 255 (2002). Criminal statutes, like the one at issue here, "must be scrutinized with particular care." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 459 (1987). The Supreme Court has held "[t]he First Amendment doctrine of overbreadth is an exception to our normal rule regarding the standards for facial challenges." *Virginia v. Hicks*, 539 U.S. 113, 118 (2003). "The showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep suffices to invalidate *all* enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Id.* at 118-19 (cleaned up). Thus, criminal statutes "that make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id.*

Section 875(c) is unconstitutionally overbroad because it prohibits a substantial amount of protected speech. If the Court interprets § 875(c) to prohibit the statements alleged in the indictment, which involve statements of public concern made to public officials, then § 875(c) is overbroad. Put simply, statements relating to any matter of political, social, or other concern of the community are protected by the First Amendment. *Phelps*, 562 U.S. at 452. Section 875(c) is unconstitutionally vague and overbroad, and Mr. Crouse moves to dismiss the Counts One through Five of the Superseding Indictment.

**C. Section 2261A(2) is unconstitutional as applied to Mr. Crouse because criminalization of his speech would amount to unconstitutional content-based restriction of speech.**

"[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010) (cleaned up). But § 2261A by its terms does just that. Section 2261A(2) is unconstitutional as applied to Mr. Crouse.

**1. The legislative history of 18 U.S.C. § 2261A(2)**

18 U.S.C. § 2261A states as follows:

> Whoever, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that--
>
>> (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or
>>
>> (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),
>
> shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

18 U.S.C. § 2261A (2018).

This statute, commonly referred to as the cyberstalking statute, arises out of Congress's passage of the Violence Against Women Act ("VAWA") in 1994. The VAWA was designed to address gender-motivated crimes such as domestic violence, stalking, and sexual assault. The statute has been amended four times, in 2000, 2006, 2013, and 2018. "The most notable changes between the 2006 and the 2013 versions are (1) the addition of intent to 'intimidate' among the offense's various possible mental states, and (2) the statute now criminalizes a course of conduct

24

that 'causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress.'" *United States v. Cook*, 472 F. Supp. 3d 326, 331 (N.D. Miss 2020). The government is now using one of the laws that arose out of VAWA to prosecute Mr. Crouse for airing his political grievances against elected office holders and public officials.

## 2. Section 2261A(2) is subject to the First Amendment's prohibitions on content-based speech.

While, by its own terms § 2261A(2) regulates courses of conduct, "'[c]onduct,' ... may also enjoy First Amendment protection if it is significantly imbued with elements of communication." *United States v. Ackell*, 907 F.3d 67, 73 (1st Cir. 2018); citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989). In order to obtain a conviction under § 2261A(2)(B), the government must prove the following:

> (1) Mr. Crouse used the mail, any interactive computer service or electronic communication service, or other facility of interstate commerce;
> (2) Mr. Crouse did so with the intent to kill, injure, harass, or intimidate another person;
> (3) Mr. Crouse engaged in a "course of conduct"; and
> (4) that course of conduct caused, attempted to cause, or would be reasonably expected to cause substantial emotional distress.

18 U.S.C. § 2261A(2)(B). As the superseding indictment makes clear, the "course of conduct" alleged in this case consists *entirely* of speech.

The government may not "foreclose the exercise of constitutional rights by mere labels," *NAACP v. Button*, 371 U.S. 415, 529 (1963), like "insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, solicitation of legal business, and the various other formulae for the repression for expression," *New York Times v. Sullivan*, 376 U.S. 254, 269 (1964). Likewise, the government may not evade the protections of the First Amendment protections by labeling speech as the "conduct" of "harassment" or "intimidation." The First Amendment protects

25

even speech that in "someone's eyes" may be "misguided or even hurtful." *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 57, 574 (1985).

The statute does not use the term "conduct," as a category of activity *distinct* from speech. When a communication causes harassment or intimidation because of its offensive content, it is a form of content-based speech restriction. *See, e.g., United States v. Cook*, 472 F. Supp. 3d 326, 332 (N.D. Miss. 2020) (noting that the defendant was "being prosecuted solely on the *content of his public posts* – not the *act of posting*."); *United States v. Cassidy*, 814 F. Supp.2d 574, 584 (D. Md. 2011) ("The portion of Section 2261A(2)(A) relied on in the Indictment amounts to a content-based restriction because it limits speech on the basis of whether that speech is emotionally distressing to A.Z."). Recently, the Fifth Circuit assumed without deciding that § 2261A(2)(B) could target pure speech. *United States v. Jubert*, 139 F.4th 484, 491 (5th Cir. 2025) (assuming a prosecution under § 2261A(2)(B) for a series of online Facebook posts targeted the defendant's speech).

Thus, the First Amendment protects Mr. Crouse's speech that forms the basis for Counts Six and Seven of the Indictment. The messages he left for politicians do not fall within the narrowly limited classes of speech unprotected by the First Amendment.

### 3. Criminalization of Mr. Crouse's statements amounts to an impermissible content-based restriction of speech.

"Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Put differently, a restriction is content-based if it is based on the "[l]isteners' reaction." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 134 (1992); *see also United States v. Playboy*

*Ent. Grp., Inc.*, 529 U.S. 803, 811 (2000) (holding that prohibition of transmission of communications to persons under the age of 18 is a content-based restriction because it focused on the impact of that speech). Here, § 2261A(2) is "a content-based restriction because it limits speech on the basis of whether that speech is emotionally distressing to [the alleged victim]." *Cassidy*, 814 F. Supp. 2d at 584.

A content-based restriction on protected speech must survive strict scrutiny. *See Playboy Entertainment Group,* 529 U.S. at 813. To survive strict scrutiny, the government has the burden of showing that a content-based restriction is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. Importantly, the Supreme Court has found that:

> Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists. We are expected to protect our own sensibilities simply by averting [our] eyes.

*Playboy Ent. Grp., Inc.,* 529 U.S. at 813.

The government can point to no compelling interest supporting §2261A(2). The statute seeks to criminalize speech that can cause emotional distress in the listener, if spoken with the intent to broadly harass or intimidate. But, the government cannot criminalize speech simply "because the speech in question may have an adverse emotional impact on the audience." *Boos v. Barry*, 485 U.S. 312, 322 (1988) (cleaned up).

In *Cassidy*, which involved similar statements to those at issue here, a district court in the District of Maryland held that the defendant's prosecution under § 2261A(2) was nothing more than an impermissible content-based restriction of his speech. *Cassidy*, 814 F. Supp. 2d at 585. In *Cassidy*, the defendant posted thousands of messages on Twitter and other blogs about a local religious leader, including messages directing the religious leader to commit suicide, saying, "go

27

kill yourself" and "do the world a favor and go kill yourself. P.S. Have a nice day." *Id.* at 590. The district court held that "while Mr. Cassidy's speech may have inflicted substantial emotional distress," the charged speech was protected by the First Amendment and granted the defendant's as-applied challenge to § 2261A. *Id.* at 583.

Likewise, a district court in the Northern District of Mississippi dismissed an indictment charging a violation of § 2261A(2)(B) as unconstitutional as applied to the defendant, holding criminalization of the defendant's speech—public posts on Facebook making reference to local district attorneys and police officers who prosecuted him for drug possession in state court and including phrases like "god willing I'm going to take them out"—would amount to an impermissible content-based restriction. *United States v. Cook*, 472 F. Supp. 3d 326, 339 (N.D. Miss. 2020). The Court noted that the "indictment very clearly states that he is being charged because his posts 'caused and would reasonably be expected to cause substantial emotional distress to a person, a spouse of that person or an immediate family member of that person.'" *Id.*

Just as in *Cook* and *Cassidy*, Mr. Crouse is being prosecuted based on the content of his messages. Because the government cannot show this content-based restriction is necessary to serve a compelling interest, the Court should dismiss Counts Six and Seven because they involve an impermissible criminalization of the content of Mr. Crouse's speech.

## 4. The speech at issue in Counts Six and Seven is protected First Amendment speech because it discusses matters of public concern.

The content of Mr. Crouse's voicemails that form the basis of Counts Six and Seven are constitutionally protected speech. Count Six is based on three voicemails left for Texas Senator John Cornyn, who represents Mr. Crouse. The messages were left on August 21, 2025, on the voicemail at one of the Senator's offices in Texas, using a publicly available telephone number

shared on the Senator's website for the purpose of providing the Senator's constituents with a means to contact him.[27] Each of the three charged messages discuss matters of public policy, specifically Mr. Crouse's views on the Senator's recent vote on the Big Beautiful Bill.[28] Mr. Crouse likens the Senator and his staff to Nazis and tells the Senator and his staff to commit suicide.

Likewise, Count Seven is based on four voicemails Mr. Crouse left for a public figure, the White House staff secretary. Just as in the messages at issue in Count Six, the messages in Count Seven address political matters of public concern, referencing President Trump's well-known political slogan "Make America Great Again" and telling the staff secretary to commit suicide.[29]

---

[27] *See* Contact John Cornyn, *https://www.cornyn.senate.gov/contact-john-cornyn/* (last visited Dec. 18, 2025).

[28] The Indictment does not list the statements that form the basis of Count Six. However, discovery provided to defense counsel reveals the charge stems from three separate voicemails. The three messages are:

**Voicemail 1:** "Yeah, hey, yeah. Just wanted to leave a message for the senator and his staff. I'm calling in to encourage you all to kill yourselves. You're all fucking Nazi scum. You're all disgusting and making the country worse. You've never put America first. You've never put anyone first, I promise you, everyone who has to deal with you in your life, Senator and staff, everybody, your own family, they fucking hate you, so you should kill yourself. You should just fucking end it, because no one will miss you. No one's gonna care. You're fucking Nazi scum. You're a piece of shit. You work for a Republican, okay, so just do me a favor, all of you, and pass this to the senator. And you know, make sure you tell the senator he should kill himself before you kill yourself. We need to make sure that message gets there, so just calling in letting you know you should fucking die, you're all Nazi scum, and do the world a favor and make America great again by killing yourself.

**Voicemail 2:** I'll call every fucking day you're a public servant. There is no such thing as harassment. I'll call every fucking day and encourage you Nazi fucks to kill yourselves until John Cornyn or one of his staff commits suicide. I will not rest. I'll call you every fucking day telling you to kill yourself.

**Voicemail 3:** This message if for both John Cornyn and his staff members. You should all fucking kill yourselves, especially John Cornyn, put a fucking gun in your mouth and scream as you pull the trigger. I didn't call yesterday because I was sick, but guess what? I'm gonna call every fucking day, and I'm gonna tell you fucking Nazi scum, fucks to kill yourselves until one of you commits suicide. Fucking kill yourself, you Nazi pieces of shit.

[29] The Indictment also does not list the statements that form the basis of Count Seven. However, discovery provided to defense counsel reveals the charge stems from a series voicemails left for the Staff Secretary. In addition to the messages alleged in Counts One and Two, Mr. Crouse left four additional voicemail messages.

**Voicemail 1:** "Hey, you pussy bitch. You wanna do something good for this world? Kill yourself, man. You wanna make America great again? You wanna be a little fucking pussy bitch and hide behind that fucking institution? Hide behind people like the FBI? Put a gun in your mouth, man. I promise you; nobody loves you. Nobody gives a shit about you. Your own fucking family would actually appreciate it if you killed yourself. That way, they wouldn't have to deal with your bitch ass anymore. You're a fucking pussy, dude. Put a gun in your mouth and who the world that you're not a pussy. Do something manly, kill yourself, and improve the lives of every American by fucking killing yourself, you stupid bitch.

As discussed above, the First Amendment protects those who are engaged in speech which can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). "[T]he First Amendment shields 'even hurtful speech on public issues to ensure that we do not stifle public debate.'" *United States v. Jubert*, 139 F.4th 484, 494 (5th Cir. 2025) (quoting *Phelps*, 562 U.S. at 461)). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Sullivan*, 376 U.S. at 270. That is because "speech concerning public affairs is more than self-expression; it is the essence of self-government." *Garrison v. Louisiana*, 379 U.S. 64, 74–75 (1964). Accordingly, "speech on public issues occupies

---

**Voicemail 2**: S'up, little bitch? Yeah, I'll call you every fuckin' day, multiple times a day, tell you to kill yourself. Alright? You're a little bitch, and guess what? That fuckin' FBI shit? Nothin's gonna happen. They don't give a fuck. You think anyone gives a fuck about your bitch ass? Fuck no, dude. Kill yourself. Alright? There's nothin' they can do. Nothin' they can do. Unless you actually fuckin' kill yourself, but I know you don't have the balls. I know you're a bitch pussy faggot. So, you ain't gonna do shit. Yeah. Yeah. Yeah. Yeah. Okay. I can't make direct threats against you kill yourself you piece of shit put a gun in your mouth; fuckin end it. Would be the only good thing you've ever done for anybody everyone you interact with, people at the store your own family. Everyone fucking hates you, you piece of shit so just fucking end it, kill yourself. Nothing's gonna happen to me unless you do it and I know you's a bitch. So, I'll call you every fucking day. Multiple times a day. Until…I just don't feel like it anymore. But I'm gonna let you know, you's a bitch. The only good thing you'd ever do for the world is if you fucking killed yourself, pussy.

**Voicemail 3**: What's it like being such a fucking pussy, bitch? Huh? Tell me, motherfucker. I wanna know. What's it like being such a little fucking pussy, bitch? That if I saw your ass in public, I'd knock you the fuck out, bro. I'll knock you the fuck out and spit on you, you fucking pussy. What's up, bitch? Yeah, yeah, you knows you a bitch, too. Yeah you know you're a little fucking bitch, pussy. That's why you hiding. That's why you hiding, bitch. Cause you a fucking pussy. Fucking bitch. What's up? Why don't you be a fucking man, nigga? Fucking knock your ass out if I ever fucking see you.

**Voicemail 4**: No one gives a fuck about you, dog. Kill yourself. Fucking kill yourself. I'll leave a million messages. I don't give a fuck. I won't make no threats. I'll just tell you you're a worthless piece of shit, and you should put a fucking gun in your mouth. You think I don't have the time, dog? I work from home. I'll just fucking sit here calling you all day every day, telling you that you're a fucking pussy. You should put a gun in your mouth, bitch. Yeah, you aren't shit, dog, and no one's gonna do shit to me. You send whoever the fuck you want after me, they don't fucking care. The people fucking working in government don't respect you. They don't give a shit. Dude, they think you should kill yourself. They don't fucking even know who you are. You're a fucking loser, dude. So put a gun in your mouth, dude. Because no one's gonna care. Just fucking end it. Fucking bitch. You a pussy, bitch. Fuck you. Yeah, I'll just fill up your fucking voicemail. I'll fill up your inbox. I don't give a fuck. Kill yourself, man. Fucking kill yourself. Seriously, dude, I'm telling you, I'm going to keep saying it, I'm going to call you every day until you either fucking kill yourself or I just can't leave no more messages, dog. But seriously, put a gun in your mouth, bro. no one loves you. Your own parents fucking hate you. Trust me, they fucking hate you. Kill yourself. Kill yourself. It'll be the only good you've ever done for the world, man. Put a gun in your mouth, you piece of shit.

the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers,* 461 U.S. 138, 145 (1983). Thus, a core American value is the ability to criticize and harass public figures. *See Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 47-48 (1988) (finding that the First Amendment protects the vulgar parody of public figures and holding that Jerry Falwell, a nationally known minister and political commentator, could not recover tort damages from magazine that published an advertisement portraying him in a drunken incestuous rendezvous with his mother in an outhouse).

Speech deals with matters of public concern when, for example, it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Phelps*, 562 U.S. at 453. The arguably "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Id.* (quoting *Rankin v. McPherson,* 483 U.S. 378, 387 (1987)). Thus, in *Phelps*, the Supreme Court held that the statements of fundamentalist church members while protesting a military service member's funeral was on a matter of public concern. *Id.* at 454. There, the statements at issue included placards that read "God Hates the USA/Thank God for 9/11," "Thank God for IEDs," "Fag Troops," "Semper Fi Fags," "God Hates Fags," "Maryland Taliban," "Fags Doom Nations," "Thank God for Dead Soldiers," "Pope in Hell," and "God Hates You," among others. *Id.* The Supreme Court held that while the messages may fall short of refined social or political commentary, the issues the messages highlight—such as homosexuality in the military and the "moral conduct of the United States and its citizens"—are matters of public import. *Id.* Indeed, the statements were deemed matters of public concern even if they were viewed as containing messages related specifically to the deceased military veteran and his family. *Id.*

Mr. Crouse's statements, too, deal with matters of public concern. Like the protest signs in *Phelps*, Mr. Crouse's messages dealt generally with the "moral conduct of the United States" in general, and these politicians' political actions in advancing legislation and policies that Mr. Crouse disagreed with specifically. The messages were left in response to the passage of a specific piece of legislation. Furthermore, the messages specifically referenced a political movement to which the recipients belonged, the MAGA movement.

Indeed in *Cook*, the District Court noted that on June 20, 2020, the President of the United States tweeted:

> BIG COURT WIN against Bolton. Obviously, with the book already given out and leaked to many people and the media, nothing the highly respected Judge could have done about stopping it ... BUT, strong & powerful statements & rulings on MONEY & on BREAKING CLASSIFICATION were made .... Bolton broke the law and has been called out and rebuked for so doing, with a really big price to pay. He likes dropping bombs on people, and killing them. **Now he will have bombs dropped on him.**

472 F. Supp. 3d at 337. The Court concluded that:

> "[i]f prosecutors choose to tolerate the above grievances coming from the highest office in the land, then surely a [private] citizen should likewise be allowed to vent his grievances. Their complaints are cut from the same cloth. Otherwise, our criminal justice system suffers the appearance of selective enforcement.

*Id.*

Therefore, the statements that form the basis of Counts Six and Seven are constitutionally protected statements of public concern. None of the statements that form the basis of Counts Six and Seven are "true threats." As discussed above, advocating for someone to commit suicide is not a true threat, as it suggests no action by Mr. Crouse.

The government seemingly recognizes that the statements at issue in Counts Six and Seven are not "true threats" because they did not seek an indictment on the basis. In charging Mr. Crouse,

the government does not allege that the conduct in Counts Six and Seven put the recipients of the messages in reasonable fear of death or serious bodily injury. Instead, the government charged Mr. Crouse under subsection (B) of § 2261A, alleging his speech caused substantial emotional distress.

Counts Six and Seven seek to punish Mr. Crouse criminally purely for the content of his speech. Because his speech was on a matter of public concern and because his speech did not contain any "true threats," his speech is protected by the First Amendment. Section 2261A(2) is, therefore, unconstitutional as applied to Mr. Crouse, and the Court should dismiss Counts Six and Seven of the superseding indictment.

### IV.    Conclusion

For all the reasons stated above, the prosecution of Mr. Crouse violates the First Amendment. For the foregoing reasons, Mr. Crouse respectfully asks the Court to dismiss the Superseding Indictment (ECF No. 28).

Respectfully submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender

_____
/s/ CHARLOTTE A. HERRING
Assistant Federal Public Defender
Western District of Texas
Lavaca Plaza
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025
(512) 916-5035 (FAX)
TX Bar Number: 24064026

_____
/s/ JOSE I. GONZALEZ-FALLA
Assistant Federal Public Defender

Western District of Texas
Lavaca Plaza
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025
(512) 916-5035 (FAX)
Bar Number: Texas 08135700

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of January 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

Mark Roomberg
United States Attorney's Office
903 San Jacinto Blvd., Suite 334
Austin, TX 78701

_____
/s/ CHARLOTTE A. HERRING

34

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **V.** | § | **NO.    A-25-CR-00393** |
| | § | |
| **THOMAS AUSTRIA CROUSE** | § | |
| | § | |

**O R D E R**

On this date, the Court considered Defendant's Motion to Dismiss the Superseding Indictment.  The Court, having considered the motion, is of the opinion that the motion should be granted.

IT IS THEREFORE ORDERED THAT the Defendant's Motion to Dismiss is hereby **GRANTED.**  The Superseding Indictment is HEREBY DISMISSED.

SIGNED this _____ day of _____, 2026.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE