IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| Plaintiff, | § § | |
| v. | § | 1:25-CR-393-RP |
| THOMAS AUSTRIA CROUSE, | § § § | |
| Defendant. | § § | |

## ORDER

Before the Court are two motions to dismiss the indictment[1] by Defendant Thomas Austria Crouse ("Defendant"), (Dkts. 43, 44), the government's amended responses, (Dkts. 54, 55), and Defendant's replies, (Dkts. 59, 60). In his First Motion to Dismiss, Defendant moves to dismiss the Indictment because (1) the statements at issue are speech protected by the First Amendment, (2) the statute that Counts One through Five charge him with violating—18 U.S.C. § 875(c)—is unconstitutionally vague and overbroad, and (3) the statute that Counts 6 and 7 charge him with violating—18 U.S.C. §2261A(2)—is unconstitutional as applied to him. (Mot. Dismiss, Dkt. 43). In his Motion to Dismiss for Selective Prosecution, Defendant moves to dismiss the indictment for unconstitutional selective prosecution, or, alternatively, asks the Court to order discovery on his selective prosecution claim. (Mot. Dismiss Selective Prosecution, Dkt. 44.). On February 9, 2026, the Court held a hearing on both motions, at which each side presented arguments. After considering the briefing, record, arguments made at the hearing, and the applicable law, the Court will grant in part and deny in part Defendant's First Motion to Dismiss and will deny Defendant's Motion to Dismiss for Selective Prosecution.

---

[1] For clarity, Defendant's first motion to dismiss will be referred to as "First Motion to Dismiss" and Defendant's second motion to dismiss will be referred to as "Motion to Dismiss for Selective Prosecution."

1

## I. BACKGROUND

Defendant is charged with five counts of making threatening communications interstate in violation of 18 U.S.C. § 875(c) and two counts of cyberstalking in violation of 18 U.S.C. § 2261A(2). The factual basis for these charges is a series of messages—voicemails and one online post—made between June and August of 2025 and directed at Republican Senators and members of the Presidential administration. The specific allegations against Defendant, laid out chronologically, are as follows:

On June 9, 2025, Defendant posted a message on X, formerly Twitter, directed to "@Sec_Noem," the account for Krisit Noem, Secretary of the Department of Homeland Security, saying:

> imma kill you you stupid stank bitch you're gonna fucking die by my hand I'm gonna murder you and your whole fucking family.

This post serves as the basis for Count Three of the indictment.

On July 3, 2025, Defendant left a message on the main line for the Washington, D.C. office of Senator Kevin Cramer saying:

> [Kevin Cramer you're gonna fucking die. You're gonna kill yourself because you just betrayed this nation. You want to make America great again. You want to do something good for your country.]² Put a fucking gun in your mouth and kill yourself, you stupid bitch, or I'll fucking find you and I'll fucking kill you myself. [Motherfucker, if you're a staffer listening to this shame on you for working for a fucking Nazi, you should put a gun in your mouth and kill yourself too. You stink. Motherfucker.]

This message serves as the basis for Count Four of the indictment.

On July 18, 2025, Defendant left a message on the main line for the D.C. office of Senator Tedd Budd, saying:

---

² Bracketed portions of these quotes were not included in the indictment, but were provided in Defendant's Motion to Dismiss, (Dkt. 43), based on discovery provided to the Defense, and are not contested by the government, (*see* Am. Resp., Dkt. 55, at 2–4).

> [Hey Tedd Budd, you fucking dumb ass piece of shit. Listen the fuck up. You want to make America great again, instead of voting for a bill that bankrupts half your citizens, kill yourself. Put a fucking gun in your mouth and kill yourself, and this country will become greater than you could ever think.] You need to fucking die. If you don't kill yourself, I'll find you and I'll fucking kill you stupid bitch. [And guess what, if you're a fucking staffer listening to this, shame on you for working for a fucking Nazi. You should kill yourself too, motherfucker.]

This message serves as the basis for Count Five of the indictment.

Additionally, at some time in July, an agent with the U.S. Secret Service interviewed Defendant and his family and friends in response to his post on X from June 9, 2025. (Am. Resp., Dkt. 55, at 2).

On August 21, 2025, Defendant left three voicemails[3] on the office line for Senator John Cornyn, saying:

> Voicemail 1: Yeah, hey, yeah. Just wanted to leave a message for the senator and his staff. I'm calling in to encourage you all to kill yourselves. You're all fucking Nazi scum. You're all disgusting and making the country worse. You've never put America first. You've never put anyone first, I promise you, everyone who has to deal with you in your life, Senator and staff, everybody, your own family, they fucking hate you, so you should kill yourself. You should just fucking end it, because no one will miss you. No one's gonna care. You're fucking Nazi scum. You're a piece of shit. You work for a Republican, okay, so just do me a favor, all of you, and pass this to the senator. And you know, make sure you tell the senator he should kill himself before you kill yourself. We need to make sure that message gets there, so just calling in letting you know you should fucking die, you're all Nazi scum, and do the world a favor and make America great again by killing yourself.

> Voicemail 2: I'll call every fucking day you're a public servant. There is no such thing as harassment. I'll call every fucking day and encourage you Nazi fucks to kill yourselves until John Cornyn or one of his staff commits suicide. I will not rest. I'll call you every fucking day telling you to kill yourself.

> Voicemail 3: This message is for both John Cornyn and his staff members. You should all fucking kill yourselves, especially John Cornyn, put a fucking gun in your mouth and scream as you pull the trigger. I didn't call yesterday because I was sick, but guess what? I'm gonna call every fucking day, and I'm gonna tell you fucking Nazi scum,

---

[3] The actual messages at issue in Counts Six and Seven were not reproduced in the indictment but were provided by Defendant in his first motion to dismiss, (Dkt. 43), are not contested by the government (see Am. Resp., Dkt. 55, at 2–5). The Court also notes that, despite the text of the messages seeming to suggest that the calls occurred over several days ("I didn't call yesterday"), both parties seem to suggest that all calls occurred on August 21, 2025. (*See* Third Superseding Indictment, Dkt. 64, at 4; Mot. Dismiss, Dkt. 43, at 28).

fucks to kill yourselves until one of you commits suicide. Fucking kill yourself, you Nazi pieces of shit.

These messages serve as the basis for Count Six of the indictment.

On or about August 25, 2025, Defendant left a voicemail[4] for Will Scharf, Staff Secretary to President Trump, saying:

> Hey, if this is fucking [Will Shwarf, Will Scharf,] whatever man, the piece of fucking shit that's [handing Trump those executive orders,] if this is you, I'm going to find you, and I'm going to cut your fucking head off, bitch. I'm going to kill you, and then I'm going to kill your fucking family, bitch [fuck you.]

This voicemail serves as the basis for Count One of the indictment.

On the evening of August 25, 2025, the Assistant Director of the Criminal Investigative Division for the Federal Bureau of Investigations ("FBI") emailed in reference to the above message saying, in part, "[p]assing along for follow up as referral from The Director." (Reply Ex. A, Dkt. 60-1, at 2). The next day, August 26, 2025, Defendant was interviewed by FBI agents about his above message to Scharf. (Mot. to Dismiss, Dkt. 43, at 12; Resp., Dkt. 55, at 4). That same day, August 26, 2025, Defendant left five additional voicemails for Will Scharf, at the same number, one of which is the basis for Count Two of the indictment, and the other four of which are the basis for Count Seven of the indictment. The voicemail that is the basis for Count Two states:

> Dude, telling the fucking FBI, you's a bitch…Let me catch you in public; I'll knock you the fuck out, bitch.

And the voicemails that are the basis for Count Seven state:

> Voicemail 1: "Hey, you pussy bitch. You wanna do something good for this world? Kill yourself, man. You wanna make America great again? You wanna be a little fucking pussy bitch and hide behind that fucking institution? Hide behind people like the FBI? Put a gun in your mouth, man. I promise you; nobody loves you. Nobody gives a shit about you. Your own fucking family would actually appreciate it if you killed yourself. That way, they wouldn't have to deal with your bitch ass anymore. You're a fucking pussy, dude. Put a gun in your mouth and who the world that you're

---

[4] The voicemail was left at the phone number listed for Mr. Scharf on the Florida Bar website.

not a pussy. Do something manly, kill yourself, and improve the lives of every American by fucking killing yourself, you stupid bitch.

Voicemail 2: S'up, little bitch? Yeah, I'll call you every fuckin' day, multiple times a day, tell you to kill yourself. Alright? You're a little bitch, and guess what? That fuckin' FBI shit? Nothin's gonna happen. They don't give a fuck. You think anyone gives a fuck about your bitch ass? Fuck no, dude. Kill yourself. Alright? There's nothin' they can do. Nothin' they can do. Unless you actually fuckin' kill yourself, but I know you don't have the balls. I know you're a bitch pussy faggot. So, you ain't gonna do shit. Yeah. Yeah. Yeah. Okay. I can't make direct threats against you kill yourself you piece of shit put a gun in your mouth; fucking end it. Would be the only good thing you've ever done for anybody everyone you interact with, people at the store your own family. Everyone fucking hates you, you piece of shit so just fucking end it, kill yourself. Nothing's gonna happen to me unless you do it and I know you's a bitch. So, I'll call you every fucking day. Multiple times a day. Until . . . I just don't feel like it anymore. But I'm gonna let you know, you's a bitch. The only good thing you'd ever do for the world is if you fucking killed yourself, pussy.

Voicemail 3: What's it like being such a fucking pussy, bitch? Huh? Tell me, motherfucker. I wanna know. What's it like being such a little fucking pussy, bitch? That if I saw your ass in public, I'd knock you the fuck out, bro. I'll knock you the fuck out and spit on you, you fucking pussy. What's up, bitch? Yeah, yeah, you knows you a bitch, too. Yeah you know you're a little fucking bitch, pussy. That's why you hiding. That's why you hiding, bitch. Cause you a fucking pussy. Fucking bitch. What's up? Why don't you be a fucking man, nigga? Fucking knock your ass out if I ever fucking see you.

Voicemail 4: No one gives a fuck about you, dog. Kill yourself. Fucking kill yourself. I'll leave a million messages. I don't give a fuck. I won't make no threats. I'll just tell you you're a worthless piece of shit, and you should put a fucking gun in your mouth. You think I don't have the time, dog? I work from home. I'll just fucking sit here calling you all day every day, telling you that you're a fucking pussy. You should put a gun in your mouth, bitch. Yeah, you aren't shit, dog, and no one's gonna do shit to me. You send whoever the fuck you want after me, they don't fucking care. The people fucking working in government don't respect you. They don't give a shit. Dude, they think you should kill yourself. They don't fucking even know who you are. You're a fucking loser, dude. So put a gun in your mouth, dude. Because no one's gonna care. Just fucking end it. Fucking bitch. You a pussy, bitch. Fuck you. Yeah, I'll just fill up your fucking voicemail. I'll fill up your inbox. I don't give a fuck. Kill yourself, man. Fucking kill yourself. Seriously, dude, I'm telling you, I'm going to keep saying it, I'm going to call you every day until you either fucking kill yourself or I just can't leave no more messages, dog. But seriously, put a gun in your mouth, bro. no one loves you. Your own parents fucking hate you. Trust me, they fucking hate you. Kill yourself. Kill yourself. It'll be the only good you've ever done for the world, man. Put a gun in your mouth, you piece of shit.

The next day, August 27, 2025, Defendant was charged and arrested. (Dkts. 1, 12). As noted above, the messages that are the basis for Counts Six and Seven—cyberstalking—are not included in the indictment, even in partial form. Instead, they are described as "making multiple harassing telephone calls to the office of Public Official Victim 5 and urging V5 and V5's staff to kill themselves," and as "making multiple harassing telephone calls to the office of Public Official Victim 1 to kill themselves." (Third Superseding Indictment, Dkt. 64, at 4–5).

## II. LEGAL STANDARD

Both of Defendant's motions to dismiss his indictment are pursuant to Federal Rule of Criminal Procedure 12, which provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A pretrial motion to dismiss can be granted where "the infirmity in the prosecution is essentially one of law" and does not "involve[] determinations of fact." *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (also stating that "[i]f a question of law is involved, then consideration of the motion is generally proper."), *abrogated on other grounds by Abramski v. United States*, 573 U.S. 169, 191 (2014). A court "may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Id.* at 324 n.6. However, "[t]here is no authority under Rule 12 . . . to dismiss on the basis of a sufficiency-of-the evidence defense which raises factual questions embraced in the general issue." *United States v. Mann*, 517 F.2d 259, 267 (5th Cir. 1975) (cleaned up). The question here is not, then, whether there is ultimately sufficient evidence to convict Defendant, but instead whether the undisputed facts before the Court show that, as a matter of law, Defendant cannot be convicted of the charged offenses.

**a. Selective Prosecution**

Federal Rule of Criminal Procedure 12(b)(3)(A)(iv) directs that the defense of "selective or vindictive prosecution" is one that "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12. To establish a selective prosecution claim, a defendant must demonstrate two elements: "both a discriminatory effect *and* a discriminatory intent." *United States v. Hall*, 455 F.3d 508, 523 (5th Cir. 2006) (emphasis in original).

First, to show discriminatory effect, "a defendant must make a prima facie showing that he has been singled out for prosecution while others similarly situated and committing the same acts have not." *United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984). The Fifth Circuit has indicated that a selective decision to prosecute *(i.e.*, discriminatory effect) can be shown sufficiently for a prima facie case where large numbers of people committing the same or similar act were not prosecuted. *See United States v. Greene*, 697 F.2d 1229, 1234 (5th Cir. 1983) ("Of the approximately 300 air traffic control specialists who failed to report for work . . . only six individuals, including the three defendants here, were prosecuted."); *see also United States v. Hoover*, 727 F.2d 387, 389 (5th Cir. 1984) ("[Defendant] has met the first part of the test for showing selective prosecution. Over three hundred air traffic controllers failed to report to work in the Houston area; yet only three individuals, including [defendant], were prosecuted."). Likewise, selective prosecution may be shown where, unlike in situations "where the government argue[s] that it [has] prosecuted all *known* violators, the United States . . . acknowledges that there was some selectivity in singling out the defendants for prosecution." *Greene*, 697 F.2d at 1234 (emphasis in original).

Second, to show discriminatory intent, a defendant "must then demonstrate that the government's discriminatory selection of him for prosecution has been invidious or in bad faith in that it rests upon such impermissible considerations as race, religion, or the desire to prevent his

7

exercise of constitutional rights." *Id.* Additionally, "discriminatory purpose can be shown if the government 'followed any special or unusual procedures in deciding to prosecute him rather than' other similarly situated individuals." *United States v. Young*, 231 F. Supp. 3d 33, 104 (M.D. La. 2017). (citing *Hoover*, 727 F.2d at 391). "To dispel the presumption of prosecutorial good faith, a criminal defendant must present clear evidence to the contrary." *Webster*, 162 F.3d at 334 (citations and internal quotations omitted). Put another way, "the presumption of regularity supports . . . prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (cleaned up).

If a defendant meets both requirements, the burden then shifts to the government to demonstrate a legitimate basis for selecting the defendant for prosecution. *Hoover*, 727 F.2d at 398. However, "making such a prima facie showing of selective prosecution is a difficult task," and "few parties have succeeded in shifting the burden of proof to the government." *Greene*, 697 F.2d at 1235 (citations omitted). Moreover, the Supreme Court has stated that "[t]he justifications for a rigorous standard for the elements of a selective-prosecution claim thus require a correspondingly rigorous standard for discovery in aid of such a claim." *Armstrong*, 517 U.S. at 468. The Fifth Circuit has interpreted this to mean that the two-part standard for a prima facie showing of selective prosecution also applies to demonstrating an entitlement to discovery in aid of a selective prosecution claim. *Webster*, 162 F.3d at 335.

### III. DISCUSSION

#### a. First Motion to Dismiss

Defendant argues that (1) all counts of the Indictment should be dismissed because his speech is constitutionally protected, because it was directed towards public officials on matters of public concern and did not constitute true threats as a matter of law; (2) Counts One through Five

8

should be dismissed because § 875(c) is unconstitutionally vague and overbroad; and (3) Counts Six and Seven should be dismissed because § 2261A(2) is unconstitutional as applied to him.

### i. True Threats

"True threats" are an exception to First Amendment protections—one of the "few historic and traditional categories of expression" that the government may restrict for its content. *United States v. Jubert,* 139 F.4th 484, 490 (5th Cir. 2025). "True threats are serious expressions conveying that a speaker means to commit an act of unlawful violence." *Id.* (quoting *Counterman v. Colorado*, 538 U.S. 343, 359 (2003)). Or, as the Supreme Court has explained, "[t]he 'true' in that term distinguishes what is at issue from jests, 'hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). "Speech is a true threat and therefore unprotected if an objectively reasonable person would interpret the speech as a serious expression of an intent to cause a present or future harm." *Jubert*, 139 F.4th at 490 (quoting *Porter v. Ascension Par. Sch. Bd.*, 393 F.3d 608, 616 (5th Cir. 2004)). "The existence of a threat depends not on 'the mental state of the author,' but on 'what the statement conveys' to the person on the other end"—though liability for making a true threat requires a showing of at least recklessness. *Counterman*, 600 U.S. at 74, 82. Courts recognize that "[t]he language of the political arena . . . is often vituperative, abusive, and inexact," and consider factors like whether a statement was "expressly conditional" in determining whether it constitutes true threat. *See Watts v. United States*, 394 U.S. 705, 708 (1969) (holding that the statement "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J." was not a true threat in part because it was conditional); *see also United States v. O'Dwyer*, 443 F. App'x 18, 20 (5th Cir. 2011) (considering in part whether a "statement [was] hypothetical and conditional") *and United States v. Goltz*, No. 23-10851, 2024 WL 3355355, at *2 (5th Cir. July 10, 2024) (noting that statements "were not clearly or obviously hypothetical or conditional."). Where a defendant is prosecuted for making

9

allegedly threatening statements, if those statements could not be true threats as a matter of law, dismissal is appropriate. *See, e.g.*, *O' Dwyer*, 433 F. App'x at 20. Here, then, the question is whether Defendant's statements cannot, as a matter of law, constitute true threats.

The statements that are the basis for Counts One through Five and Count Seven all contain language that, on its face, appears threatening—in that those statements all suggest that the speaker will or would commit an act of violence against the recipient.[5] Defendant argues that many of these statements are, in context, hypothetical or conditional. (Mot. Dismiss, Dkt. 43, at 7–19). However, while the conditionality of a statement is a relevant consideration, *see Watts*, 394 U.S. at 708, courts in the Fifth Circuit have found true threats even where a statement involved a degree of uncertainty or some intervening events. *See United States v. Myers*, 104 F.3d 76, 78–79 (5th Cir. 1997) (violence threatened if the defendant's wife died or if the recipient did not provide help). Moreover, the analysis of whether these statements qualify as true threats when taken in context is more appropriate for when that context is apparent—*i.e.*, on the full trial record. Considering that the statements contain threatening language and their hypothetical, conditional, or hyperbolic nature depends on context that is not yet fully established, the Court cannot now say that the statements that are the basis of Counts One through Five and Count Seven are, as a matter of law, not true threats.

---

[5] Examples of such language for each Count include:
Count One: "I'm going to find you, and I'm going to cut your fucking head off, bitch. I'm going to kill you, and then I'm going to kill your fucking family"
Count Two: "Let me catch you in public; I'll knock you the fuck out"
Count Three: "you're gonna fucking die by my hand I'm gonna murder you and your whole fucking family"
Count Four: "Put a fucking gun in your mouth and kill yourself, you stupid bitch, or I'll fucking find you and I'll fucking kill you myself."
Count Five: "You need to fucking die. If you don't kill yourself, I'll find you and I'll fucking kill you"
Count Seven: "if I saw your ass in public, I'd knock you the fuck out, bro. I'll knock you the fuck out and spit on you"

10

Additionally, Defendant's argument that many, if not all, of these statements are entitled to heighted protection as statements on matters of public concern, (Mot. Dismiss, Dkt. 43, at 6–33), also does not support dismissal here. True threats are an exception to First Amendment protection—as a result, it does not matter that a statement might qualify for heighted protection if it was *not* a true threat; if a statement is a true threat, it is outside of the First Amendment's protections.

By contrast, the statements that are the basis for Count Six make no reference to Defendant himself committing any violence—instead, they urge suicide. They cannot, therefore, be "serious expressions conveying that [the] speaker means to commit an act of unlawful violence." *Jubert*, 139 F.4th at 490; *see also United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (describing true threats as "those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals."). These statements may be crass, abrasive, and undesirable—but they are not, as a matter of law, true threats. The implications of this conclusion are discussed below, where the Court turns to Defendant's as-applied challenge to § 2261A(2).

### ii. Overbreadth and Vagueness of § 875(c)

Defendant argues in the alternative that, if Counts One through Five are not dismissed because his statements were not true threats, they should be dismissed because § 875(c) is unconstitutionally vague and overbroad. (Mot. Dismiss, Dkt. 43, at 20–23). The relevant provision, § 875(c), provides that "[w]hoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. 875(c).

A criminal statute is void for vagueness if the conduct it prohibits is not clearly defined. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). This can be true if it (1) "fails to give a person of

11

ordinary intelligence fair notice that his contemplated conduct is forbidden," *United States v. Harriss*, 347 U.S. 612, 617 (1954), or (2) "encourages arbitrary and erratic arrests and convictions," *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972). Fair notice for people "of common intelligence" is the "first essential of due process." *United States v. Davis*, 588 U.S. 445, 451 (2019) (cleaned up). For a challenge based on the First Amendment, courts may consider whether the statute is unconstitutionally vague on its face. *United States v. Williams*, 553 U.S. 285, 304 (2008).

The overbreadth standard is related, in that "[t]he overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled in the process." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 255 (2002). As a result, "[t]he showing that a law punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep, suffices to invalidate all enforcement of that law, until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003). "To justify facial invalidation, a law's unconstitutional applications must be realistic, not fanciful, and their number must be substantially disproportionate to the statute's lawful sweep." *United States v. Hansen*, 599 U.S. 762, 770 (2023). The Supreme Court has directed that the "strong medicine" of invalidation for overbreadth "is not to be 'casually employed,'" and that "[i]n the absence of a lopsided ratio, courts must handle unconstitutional applications . . . case-by-case." *Id.*

Turning to the statute at hand, it does not appear that the Fifth Circuit has directly considered a vagueness challenge to § 875(c). However, the Ninth Circuit considered a vagueness challenge to § 875(c) in 2007. *United States v. Sutcliffe*, 505 F.3d 944, 953–54 (9th Cir. 2007). It weighed the narrowing constructions created by caselaw—only allowing the statute to apply to true threats and, at the time, requiring specific intent to threaten—and concluded that between those narrowing constructions and the ability of an ordinary citizen to understand the statute's terms,

12

§ 875(c) "provides sufficient standards to allow enforcement in a non-arbitrary manner." *Id.* In 2024, the Third Circuit reasoned similarly, concluding that "[a] conviction under . . . § 875(c) requires proof of both a subjective and an objective component; the subjective component is satisfied if the defendant transmitted a communication for the purpose of issuing a threat or with the knowledge it would be viewed as one. . . . This subjective component alleviates concerns that 'a defendant will be convicted for an action that he or she committed by mistake.'" *United States v. Miah*, 120 F.4th 99, 108 (3d Cir. 2024). However, since the Ninth Circuit's ruling, the Supreme Court has concluded that prosecutions for true threats only require a recklessness standard—not the narrowing construction requiring specific intent to threaten that the Ninth Circuit considered.[6] *Counterman*, 600 U.S. at 82. Defendant argues that the fact "[t]hat Section 875(c) requires only a reckless mens rea renders the statute unconstitutionally vague." (Mot. Dismiss, Dkt 43, at 22). The Court recognizes that "vagueness of content-based regulation of speech is of special concern when it comes to criminal statutes." *Counterman*, 600 U.S. at 100 (Sotomayor, J., concurring) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 871–872 (1997) (cleaned up). However, the Court does not believe that the Supreme Court's acceptance of a recklessness standard in *Counterman* so shifted the reach of § 875(c) that the Ninth and Third Circuit's reasoning does not still apply: the statute's application only to true threats, the requirement to show at least recklessness, and the general accessibility of

---

[6] Previously, the Supreme Court had stated that "[t]here is no dispute that the mental state requirement in Section 875(c) is satisfied if the defendant transmits a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," but had left open the question of whether recklessness suffices. *Elonis v. United States*, 575 U.S. 723, 740 (2015). Subsequently, in *Counterman*, 600 U.S. at 69, the Court reached the issue in the context of a different statute—stating that "[t]he question presented is whether the First Amendment still requires proof that the defendant had some subjective understanding of the threatening nature of his statements. We hold that it does, but that a mental state of recklessness is sufficient. The State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." The government points to the Third Circuit's decision in *Miah* as a post-*Counterman* decision, (Am. Resp., Dkt. 54, at 18), which is chronologically true—however, because the Third Circuit described the subjective standard requirement of § 875(c) as requiring "purpose" or "knowledge" and cited *Elonis*, 841 F.3d at 596, it is not clear to the Court that the Third Circuit was actively grappling with the implications of *Counterman* there, and therefore not clear that *Miah* directly addresses the implications of a recklessness standard.

13

language like "threat to kidnap any person or any threat to injure the person of another" means that the statute is not unconstitutionally vague. *See* 18 U.S.C. § 875(c). In line with the Ninth and Third Circuits, the Court concludes that this is true despite these limiting constructions not appearing on the face of the statute.

Similarly, the limiting construction that allows § 875(c) to only reach true threats helps ensure that the statute cannot reach far beyond its plainly legitimate sweep—a legitimate sweep which is of course limited to unprotected speech, *i.e.*, true threats. While there is of course still a risk that the statue will chill speech that does not qualify as true threats, Defendant has not shown that the unconstitutional applications of the statute are "substantially disproportionate to the statute's lawful sweep" sufficiently to justify facial invalidation. *See Hansen*, 599 U.S. at 770.

### iii. As-Applied Challenge to § 2261A(2)

The statutory provision at issue, 18 U.S.C. § 2261A(2), provides that:

> Whoever, with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, uses the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce to engage in a course of conduct that—
> > (A) places that person in reasonable fear of the death of or serious bodily injury to a person, a pet, a service animal, an emotional support animal, or a horse described in clause (i), (ii), (iii), or (iv) of paragraph (1)(A); or
> > (B) causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person described in clause (i), (ii), or (iii) of paragraph (1)(A),
> shall be punished as provided in section 2261(b) or section 2261B, as the case may be.

18 U.S.C. § 2261A (2018).

Defendant claims that, as applied to him, § 2261A(2) regulates pure speech based on that speech's content and therefore must survive strict scrutiny—which, he argues, it cannot. (Mot. Dismiss, Dkt. 43, at 26–28). The government argues that, in *Jubert*, 139 F.4th at 494, the Fifth Circuit concluded that the statute regulated a course of conduct, not simply speech. (Am. Resp., Dkt. 54, at

14

23–24). However, in *Jubert*—where the defendant had made threatening statements—the Fifth Circuit concluded that § 2261A(2) regulates a course of conduct on its face, but, in considering the defendant's as-applied challenge, "assume[d] without deciding that § 2261A(2)(B), as enforced here, target[ed] . . . speech." *Jubert*, 139 F.4th at 491. The Fifth Circuit held the statute constitutional as applied because the defendant had made true threats. *Id.* (noting that defendant said, for example, "I can't wait to FFFFFF u up, its coming soon, ur life will cease.").

Here, because the conduct charged is Defendant's speech, the Court concludes that as applied, § 2261A(2) does regulate pure speech and therefore, if that speech is constitutionally protected, the statute must survive strict scrutiny. As discussed above, Defendant's statements that are the basis of Count Seven may contain true threats—such that the Court cannot, as a matter of law, conclude that they do not—and therefore those statements are not clearly protected by the First Amendment. As a result, the Court cannot conclude at this stage that § 2261A(2) is unconstitutional as applied in Count Seven. However, as also discussed above, Defendant's statements that are the basis of Count Six do not, as a matter of law, constitute true threats. As a result, Defendant's speech there is constitutionally protected and, to regulate it, § 2261A(2) must survive strict scrutiny. *See Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 187 (5th Cir. 2000) (quoting *Bartnicki v. Vopper*, 200 F.3d 109, 121 (3d Cir. 1999), *aff'd*, 532 U.S. 514, (2001)) ("[W]hen a statute that regulates both speech and conduct is applied to an act of pure speech, that statute must meet the same degree of First Amendment scrutiny as a statute that regulates speech alone.") *and TikTok Inc. v. Garland*, 604 U.S. 56, 67, (2025) ("Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."). The government has not shown that the statute, as applied, is narrowly tailored to serve a compelling state interest. As a result, § 2261A(2) is unconstitutional as applied in Count Six, and that count must be dismissed.

### b. Motion to Dismiss for Selective Prosecution

In his second motion to dismiss, Defendant argues that his case must be dismissed because it represents an unconstitutional selective prosecution—alleging that he was targeted for prosecution on the basis of his "left-leaning" political views. (Mot. Dismiss Selective Prosecution, Dkt. 44, at 3–4). More specifically, Defendant alleges that "[t]he government has failed to prosecute countless others who have engaged in similar or even more serious political rhetoric, including countless 'right-wing' politicians holding high offices." (*Id.* at 2).

In support of this contention, Defendant introduces statistical evidence on the rate of "concerning statements and direct threats against the Members of Congress, including their families and staff"—approximately 7,501 in 2024—in contrast to the total number of prosecutions under all federal threat and extortion statutes—278 in 2024. (*Id.* at 5). This certainly establishes that a very small percentage of threats made against members of Congress are prosecuted. However, these statistics do not account for some of the uncontested specific conditions surrounding Defendant's alleged statements—for example, that he was visited by U.S. Secret Service agents and FBI agents, or that he made a series of calls to multiple officials. Without more, it is not possible to determine the extent to which Defendant was truly singled out compared to similarly situated individuals. Nor does Defendant's identification of unprosecuted violent or threatening statements made by political figures, government agencies, and many other social media users, (*see id.* at 6; Mot. Dismiss Selective Prosecution Ex. A, Dkt. 44-1; Mot. Dismiss Selective Prosecution Ex. B, Dkt. 44-2), show the necessary degree of similarity for the Court to conclude that Defendant "has been singled out for prosecution while others similarly situated and committing the same acts have not." *See Hoover*, 727 F.2d at 389. Again, it is undoubtedly true that other individuals have made violent or threatening statements and have not been prosecuted—but because of the specific circumstances surrounding

16

Defendant's statements, the Court cannot conclude on the available evidence that Defendant was impermissibly singled out.

The Court notes that Defendant has brought forward some evidence that the government "followed . . . special or unusual procedures in deciding to prosecute him." *See Hoover*, 727 F.2d at 391. Specifically, as noted above, on the first day that Defendant contacted a member of the White House staff—August 25, 2025—an Assistant Director for the FBI emailed in reference to Defendant's message saying, in part, "[p]assing along for follow up as referral from The Director." (Reply Ex. A, Dkt. 60-1, at 2). The next day, Defendant was interviewed by FBI agents, and one day later, after having made additional calls, he was charged and arrested. However, even if this evidence could satisfy the discriminatory intent prong for a prima facie showing of selective prosecution, the Fifth Circuit is clear that *both* discriminatory effect—the decision not to prosecute similarly-situated individuals—and intent must be shown. *See Hall*, 455 F.3d at 523. Because Defendant has not shown that he is truly similarly situated to other individuals who were not prosecuted, he cannot show discriminatory effect—and therefore cannot make out a prima facie case of selective prosecution. Moreover, because Defendant cannot make out a prima facie case under the Fifth Circuit rule, he is not entitled to discovery on his selective prosecution claim. *See Webster*, 162 F.3d at 335.

## IV. CONCLUSION

For the reasons stated above, **IT IS ORDERED** that Defendant's First Motion to Dismiss, (Dkt. 43), is **GRANTED IN PART AND DENIED IN PART**. The Motion is **DENIED** as to Counts One through Five and Seven but **GRANTED** as to Count Six.

**IT IS FURTHER ORDERED** that Defendant's Motion to Dismiss for Selective Prosecution, (Dkt. 44), is **DENIED**.

**SIGNED** on February 16, 2026.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE